UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-4-15
```

UNITES STATES OF AMERICA

-v-

GEORGE LANDEGGER,
                    Defendant.

No. 15-cr-32 (RJS)
ORDER

RICHARD J. SULLIVAN, District Judge:

The Clerk of the Court is respectfully directed to docket the attached letter from non-

party Steven P. Hawkes, received in chambers in anticipation of Defendant's sentencing.

SO ORDERED.

Dated:        May 4, 2015
              New York, New York

                                    RICHARD J. SULLIVAN
                                    UNITED STATES DISTRICT JUDGE

RECEIVED
MAY 0 4 2015
CHAMBERS OF
RICHARD J. SULLIVAN
U.S.D.J.

April 29, 2015

Honourable Richard J. Sullivan
500 Pearl Street
New York, New York
10007

Your Honour:

The former employees of St Anne Nackawic Pulp Company Ltd. have asked me to send you information on their behalf as we are aware you will be sentencing George Landegger in May, 2015. We are concerned he had secret Swiss bank accounts and he repeatedly failed to declare them to the IRS. He also took steps to conceal his ownership of the accounts. He further admitted that he maintained the undeclared account worth millions at the Swiss Bank in Zurich from the early part of the last decade to 2010.

My name is Steven Hawkes and I am a former employee of St. Anne Nackawic Pulp with over 34 years of service. George Landegger owned St. Anne until it went bankrupt in September, 2004. The employee pension fund was a defined pension and Mr Landegger left the pension plan 41 million dollars underfunded. This was a complete and horrible shock to the 725 employees who had worked at the mill.

We believe there could be many more bank accounts hidden from the IRS where money from our pension and the bankruptcy of the St. Anne mill is hidden. His admission of pleading guilty to federal fraud charges related to millions of dollars stashed in secret bank accounts leads many former employees to feel their personal lose of millions of dollars ended up hidden in secret bank accounts as well. The timing of creating these accounts is a factor in assuming this theory.

Many creditors have concluded that the St Anne Nackawic bankruptcy was illegal. They believe it was a fraudulent and deceitful plan by the owner George Landegger, to extract as much money and assets as possible from the taxpayers and government of New Brunswick, the contractors, wood suppliers, businesses, pensioners, and employees. George Landegger's company, St. Anne Industries, was **first** secured creditor and **first** in line to be paid, before all other creditors.

Please find attached a few examples of many on record which George Landegger carried out to secure the most gain for himself while taking away pensions, benefits, severance and money from former loyal employees and creditors. Following the examples, an outline of exhibits including data and evidence will support these examples.

Your Honour, we hope you will take these criminal and fraudulent actions committed by Mr. Landegger into consideration when you sentence him. His actions hurt so many people in our community and our Province of New Brunswick.

Sincerely,

Steven P. Hawkes

Nackawic, N.B.      29 McNair Drive      E6G 1A3      Canada      H: 506-575-2490      Cell:780-370-5025

-1-

*Evidence and Exhibits Re: St. Anne Nackawic Pulp Company Ltd. Bankruptcy*

1.  **Exhibit  1: <u>The St.Anne Nackawic mill was consistently insolvent since at least January 1, 2000.</u>**

    The Judge states,  "**The serious issue to be tried in this case is whether St. Anne-Nackawic Pulp Company Ltd. was solvent at the time it gave security to its parent company, St. Anne Industries, Ltd. and whether the security held by St. Anne Industries, Ltd. is valid and enforceable in accordance with its terms.**"  The Judge further states, "**The only person in a position to obtain information relevant was the original trustee who had refused to conduct an independent assessment of the validity of the security held by St. Anne Industries.**" "**The trustee's response to the request was woefully inadequate.**"

    The solvency was never determined.  This Receiver  (Green Jain Wedlake Inc) was hired by George Landegger.

    Gerry O'Brien, a lawyer involved with this bankruptcy, made the following comments, "**this bankruptcy (St Anne Pulp) is the dirtiest one he has ever seen.  It is dirty for so many reasons.  How blatant they were in filing it.  It is dirty because of how blatant they were in planning it.**"

    "**That they would amend their security on the 10th of September 2004 and still take in wood. That they  would amend their security is just stupid!  I was glad to see it because it told me what they were doing.**" This lawyer has over 30 years of bankruptcy experience.

    George Landegger declared the St. Anne Nackawic Pulp Company bankrupt on September 14, 2004.

## _Exhibits_

### **Exhibit 1**  Affidavitt by Trustee

A second trustee was appointed by the courts, A.C. Poirier & Associates Inc. The Judges have made comments, which clearly indicate the Receiver, hired by George Landegger, was not acting in good faith. This is contrary to the Bankruptcy Act. Mr. Landegger owes millions of dollars to creditors and the solvency issue was never determined.   How could any kind of settlement be suggested without knowing this information?

The sworn affidavit by the Trustee, A.C. Poirier & Associates Inc. (Court Number: 10985) Paul Stehelin leaves no doubt the mill was insolvent for a long time and continued to operate. The failure to declare the mill insolvent allowed Mr. Landegger to keep his "first security" status and be the first to receive his money, totalling $35,000,000.

FEB-02-2005  10:52        A.C.Poirier & Assoc. Inc.                526 634 1285   P.02/17

# 1

Court Number: 10985
Estate Number 51-117738

IN THE COURT OF QUEEN'S BENCH OF NEW BRUNSWICK

IN BANKRUPTCY AND INSOLVENCY

JUDICIAL DISTRICT OF FREDERICTON

IN THE MATTER OF the Bankruptcy of St.
Anne-Nackawic Pulp Company Ltd.

Between:

A.C. POIRIER & ASSOCIATES INC.,
Trustee in Bankruptcy of St. Anne-
Nackawic Pulp Company Ltd.

Applicant

-and-

GREEN JAIN WEDLAKE INC., in its
capacity as Receiver of St. Anne-
Nackawic Pulp Company Ltd., and ST.
ANNE INDUSTRIES LTD.

Respondents

## AFFIDAVIT

I, Paul Stehelin, CA, CIRP, Trustee in Bankruptcy, of the Town of Quispamsis, in the County of
Kings and Province of New Brunswick, MAKE OATH AND SAY THAT:

1.  I am an Associate of A.C. Poirier & Associates Inc., Trustee in Bankruptcy of St. Anne-
    Nackawic Pulp Company Ltd. ("St. Anne-Nackawic") and have personal knowledge of
    the matters herein deposed to, except where otherwise stated.

2.  St. Anne-Nackawic Pulp Company Ltd. made an assignment in bankruptcy on September
    15, 2004.

3.  On October 25, 2004, A.C. Poirier & Associates Inc. was appointed as Trustee in
    Bankruptcy of St. Anne-Nackawic, replacing Green Jain Wedlake as Trustee in
    Bankruptcy.

4.  I continue to examine the books and records of St. Anne-Nackawic.

FEB-02-2005  10:52          A.C.Poirier & Assoc.Inc.                506 634 1206   P.03/17

5.  In addition, I continue to conduct examinations of certain officers of St. Anne-Nackawic under section 163 of the BIA.

6.  In the course of my duties as Trustee, I have been assessing the validity and extent of security interests held against the property of St. Anne-Nackawic. This examination includes an assessment of the solvency of St. Anne-Nackawic at the time that a security interest was given by St. Anne-Nackawic to its parent company, St. Anne Industries Ltd.

7.  The solvency analysis is conducted to determine if St. Anne-Nackawic fit within the definition of "an insolvent person" pursuant to section 2 of the BIA. In particular, I am seeking to determine whether the fair value of St. Anne-Nackawic's property would have been sufficient to discharge all obligations of St. Anne-Nackawic due and accruing due.

✳ 8.  I have concluded that St. Anne-Nackawic was insolvent at all material times during the period from January 1, 2001 onward.

### St. Anne-Nackawic Liquidation Analysis - December 1, 2003

9.  In a memo dated December 1, 2003, Mr. DJ White, President of St. Anne-Nackawic, provided an assessment of the results of the liquidation of St. Anne-Nackawic's assets assuming the closure of the plant in April, 2004. Attached hereto as Exhibit "A" is a copy of the said memo.

10. This memo uses the following assumptions:

    (a)  95% of the book value of accounts receivable are collected. The $950M of accounts receivable showing on the statement appears to be what is left after 95% of accounts receivable were collected. This could also represent receivable from affiliates.

    (b)  20% of book value of inventory (stores and parts only) is realized. Note that there are no finished goods or inventories as at May 31, 2004 as there was an assumption that all wood was used in production. Since 95% of receivables were collected, it appears implicit that all finished goods were converted to accounts receivable and 95% collected.

    (c)  100% of the income tax receivable amount is collected.

    (d)  40% of the book value of prepaids and other current assets is realized.

    (e)  St. Anne-Nackawic's remaining assets comprising freehold lands, mill property, plant and equipment have a book value of $67,570M and St. Anne-Nackawic assigned a realizable value of $15,000M to these assets. The Province of New Brunswick, pursuant to its security over these assets, has valued its security at $16,500M.

11.   This December 2003 assessment concludes that there would be a $42,262M shortfall in the fair value of the assets (as determined by St. Anne-Nackawic) and the estimated amount of St. Anne-Nackawic's due and accrued liabilities if the mill were to shut down in April, 2004.

### St. Anne-Nackawic Statement of Affairs - September 15, 2004

12.   The sworn Statement of Affairs dated September 15, 2004 filed by St. Anne-Nackawic with its assignment in bankruptcy, and signed by Mr. White, reflects St. Anne-Nackawic's affairs at the date of bankruptcy.  It contains the following assumptions:

      (a)   80% of the book value of trade accounts receivable are collected.
      (b)   20% of inventory (stores and part only) is realized.
      (c)   75% of the book value of the wood inventory is realized.
      (d)   80% of the book value of the finished goods inventory is realized.
      (e)   10% of the book value of the stores and parts inventories is realized.
      (f)   Nothing is realized from prepaids and other current assets.
      (g)   $20,712M is realized on the freehold forest lands with a book value of $5,396M.
      (h)   $991M is realized on the mobile equipment with a book value of $9,906M.
      (i)   Nothing is realized on the remaining mill property, mill plant and personal property not described above.

13.   Attached hereto as Exhibit "B" is a copy of the sworn Statement of Affairs.

14.   I have conducted two solvency analysis - one analysis using St. Anne-Nackawic assumptions and another using A.C. Poirier & Associates Inc. assumptions.

### Solvency Analysis using St. Anne-Nackawic Assumptions

15.   Attached hereto as Exhibit "C" is a solvency analysis for the period from January, 2000 to August, 2004.  This analysis applies the realization assumptions provided by St. Anne-Nackawic, compares them with historical asset book values and deducts St. Anne-Nackawic book liabilities in order to determine whether or not the net realization would have been sufficient to discharge all of St. Anne-Nackawic's liabilities.  The following Asset Realization Assumptions were used:

      (a)   95% of the book value of the trade accounts receivable are collected.  This assumption is the same as used by St. Anne-Nackawic in their December 1, 2003 analysis.

      (b)   75% of the book value of the wood inventory is realized.  There was no stated realization assumption regarding wood inventory in the December 1, 2003 analysis as that analysis assumed that all wood inventory was used in production. We have used the 75% recovery assumption used in the SOA analysis.

      (c)   100% of the book value of the finished goods inventory is realized.  There was no stated realization assumption regarding finished goods inventory in the December 1, 2003 analysis as that analysis assumed that all finished goods were converted to

accounts receivable and collected. We have used the 80% recovery assumption used in the SOA analysis.

(d) 20% of inventory (stores and parts only) is realized. This assumption is the same as used by St. Anne-Nackawic in their December 1, 2003 analysis.

(e) 49% of the book value of prepaids and other current assets is realized. This assumption is the same as used by St. Anne-Nackawic in their December 1, 2003 analysis.

(f) $15,000M is realized on the freehold lands.

(g) No assumption regarding the realization on the mill and other fixed assets (personal property).

16. In addition there were the following adjustments to the book value of St. Anne-Nackawic's liabilities:

(h) Added $10,000M for severance pay. This is consistent with St. Anne-Nackawic's December 1, 2003 analysis.

(i) Added $1,500M for permanent shut-down costs. This is consistent with St. Anne-Nackawic's December 1, 2003 analysis.

(j) Added $5,000M for the pension fund solvency liability. This is consistent with St. Anne-Nackawic's December 1, 2003 analysis.

17. This analysis shows that, based on St. Anne-Nackawic's own assumptions, St. Anne-Nackawic's liabilities exceed the liquidation value of St. Anne-Nackawic's assets by between $32 million and $73 million over the period from January 2000 to August 2004. This analysis does not attribute any value to the mill and the property on which it is situated or to the moveable fixed assets. Based on this analysis, St. Anne-Nackawic has been insolvent since at least January 1, 2001.

## Solvency Analysis using A.C. Poirier & Associates Inc. Assumptions

18. Attached hereto as Exhibit "D" is another solvency analysis for the period from January, 2000 to August, 2004. This analysis is the same as the St. Anne-Nackawic Assumption analysis in "Exhibit C" except that the following assumptions have been made by A.C. Poirier & Associates Inc.:

(a) The realization on accounts receivable was reduced from 95% to 80% to reflect potential set-offs and prior claims of CCRA with respect to payroll deductions.

(b) The realization on prepaids and other assets was reduced from 49% to 10% to reflect what we believe is a more realistic realization.

(c)  Increased the realization on St. Anne-Nackawic's real and personal property (excluding current assets) from $15,000M to $20,000M to reflect a more reasonable value for the freehold lands.

(d)  We added another $1,500M to account for professional fees and costs in completing a realization of the assets.

(e)  We added another $5,000M for pension fund deficiency bringing the total to $10,000M. We do not, at this time, know what the real pension fund deficiency was or is.

19.  Based on this analysis, the excess of St. Anne-Nackawic's liabilities over the net realizable value of assets ranges from $39 million to $80 million. Again, based on this analysis, St. Anne-Nackawic has been insolvent since at least January 1, 2001.

## Nature of Security Claimed by St. Anne Industries Ltd.

20.  St. Anne Industries Ltd. ("St. Anne Industries"), the parent company of St. Anne-Nackawic, makes a claim to security through the following:

(a)  General Security Agreement between St. Anne-Nackawic and St. Anne Industries dated June 25, 2002; Attached hereto as Exhibit "E"

(b)  Debenture from St. Anne-Nackawic to St. Anne Industries dated July 4, 2002; Attached hereto as Exhibit "F" is a copy of the Debenture;

(c)  A Loan Agreement between St. Anne-Nackawic and St. Anne Industries dated as of June 25, 2002; ("Loan Agreement"); Attached hereto as Exhibit "G";

21.  I have reviewed the financial affairs of St. Anne-Nackawic during the year 2001 and 2002 leading up to the granting of the security by St. Anne-Nackawic to St. Anne Industries on June 25, 2002. Attached hereto as Exhibit "H" is a copy of the audited financial statements of St. Anne-Nackawic for the years 1999 to 2003.

## TD Bank Term Loan and Operating Loan Facilities

22.  The financial statements of St. Anne-Nackawic indicate that St. Anne-Nackawic owed the Toronto Dominion Bank ("TD Bank") $36,172M as of December 31, 2001, comprised of Bank Term Loans and Operating Loans in the amount of $14,335M and $21,837M respectively. These loans were secured by a debenture held by TD Bank providing a fixed and floating charge over substantially all of St. Anne-Nackawic's real and personal property. Attached as Exhibit "I" is a copy of the St. Anne-Nackawic Monthly Balance Sheets for the years 2001 to 2004.

FEB-02-2005  10:55        A.C.Poirier & Assoc.Inc.           506 634 1205   P.07/17

23.    On November 21, 2001, TD Bank advised Arthur Schwartz, President, Parsons & Whittemore Inc. that St. Anne-Nackawic was in default of the terms of its operating and term loans, and the bank was reserving its rights of termination and acceleration. It indicates that the operating loan needed to be repaid in full by December 31, 2001.  TD Bank refers in its letter to another letter dated June 28, 2001 in which the Bank advised St. Anne-Nackawic that it did not intend to renew or extend either the Operating or Term Loans beyond existing termination dates.  Attached hereto as Exhibit "J" is a copy of the said November 21, 2001 letter.

24.    On December 20, 2001, St. Anne-Nackawic advised TD Bank by letter that St. Anne Industries , its parent company,  proposed to deliver on December 31, 2001, January 31, 2002 and February, 2002 funds in the amount of $5,000M, $3,500M and $4,000M respectively to the bank's agent to be held in escrow pending St. Anne-Nackawic's ability to obtain new financing from the Bank of Montreal.  The funds would be security for the indebtedness of St. Anne-Nackawic and it would have until March 31, 2002 to repay the outstanding loan.  Attached hereto as Exhibit "K" is a copy of the said letter.

25.    On December 28, 2001 TD Bank wrote to St. Anne-Nackawic by letter seeking clarification of St. Anne-Nackawic's December 20, 2001 correspondence, but reiterating that the Operating loan was to repaid in full by December 31, 2001.  Attached hereto as Exhibit "L" is a copy of the said letter.

26.    On December 28, 2001, St. Anne-Nackawic responded by letter to TD Bank confirming that St. Anne Industries Ltd. is the parent company of St. Anne-Nackawic, and is already a pledgor of St. Anne-Nackawic under the loan documents. Attached hereto as Exhibit "M" is a copy of the said letter.

27.    In the course of my section 163 examination of Michael Connell, Controller of St. Anne-Nackawic, Mr. Connell indicated that St. Anne-Nackawic had discussions with its auditors, Ernst & Young, with respect to the inclusion of a "going concern qualification" to the 2001, 2002 and 2003 financial statements  Attached hereto as Exhibit "N" is a copy of an extract of the transcript.

28.    St. Anne-Nackawic attempted to secure financing through other banks but was not successful. Attached hereto as Exhibit "O" is a copy of a letter dated March 19, 2002 from the Bank of Montreal to Arthur Schwartz declining financing.

29.    On March 28, 2002, St. Anne Industries  wrote by letter to St. Anne-Nackawic and TD Bank indicating that St. Anne Industries  would lend St. Anne-Nackawic sufficient funds to enable St. Anne-Nackawic under the Term Loan.  This letter does not make any reference to security being taken by St. Anne Industries  on the loan.  Attached hereto as Exhibit "P" is a copy of the said letter.

30.    On April 9, 2002 St. Anne-Nackawic wrote to TD directing payment of US $6,937,368.71 with respect to payment of the Term Loan.  Attached hereto as Exhibit "Q" is a copy of the said letter.

31.    The debt owing to TD Bank was repaid in full during 2002 using advances made on an

inter-company account by St. Anne Industries to St. Anne-Nackawic. St. Anne-Nackawic's internal monthly balance sheets show total TD loans outstanding as at December 31, 2001 of $36,172,000 and no amount outstanding as at April 30, 2002. See Exhibit "I" referenced previously, which is a copy of the said monthly balance sheets.

32.   The 2001 audited Financial Statements have an Auditors Report dated January 30, 2002 (referenced previously as EXHIBIT "H"). Note 12 to these statements, located at page 15 of the 2001 statements, is dated April 12, 2002. This note does not make any reference to St. Anne Industries taking any security for its advances. The note states:

> "On March 31 and April 10, 2002", the operating and term loans, respectively, were repaid to the lenders from funds advanced to the Company by its ultimate parent company."

33.   It is clear from Note 12 of the 2001 that the audited Financial Statements were not issued by the auditor until after April 10, 2002.

34.   The 2002 audited Financial Statements, at Note 5, page 11, states:

> "The Parent Company Loan has pledged as collateral a convert to cash $63 million (USD $40 million) debenture and general security agreement taking a security interest on accounts receivable and inventory."

35.   A Loan Agreement dated June 25, 2002, and other security documents, executed in July, 2002, between St. Anne Industries and St. Anne-Nackawic, were entered into with respect to the loan advances from St. Anne Industries to St. Anne-Nackawic (previously referenced as Exhibits "E", "F" and "G").

Conversion of "Affiliates Account" to "Subordinated Debt"

36.   In January, 2002, $4,326M of debt due to St. Anne Industries from St. Anne-Nackawic was converted from the "Due to affiliates account" to the "intercompany subordinated debt". Note 5 to the 2002 audited Financial Statements states:

> "During the first quarter of 2002, the Company received Parent Company U.S. dollar cash advances of Canadian Equivalent $34.3 million and converted a prior year intercompany advance of approximately $4.3 million into long term debt".

37.   Note 7 to the 2001 audited Financial Statements states:

> "Amounts due to affiliates represent advances from the Company's parent, are non-interest bearing, and have no set terms of payment. Subsequent to year-end, $4,326,000 of this amount was converted to subordinated debt."

FEB-02-2005  10:57        A.C.Poirier & Assoc.Inc.              506 634 1205   P.09/17

38.   I have not found any security documentation dealing with any of the advances made by St. Anne Industries or the ultimate parent to pay out the indebtedness owed to TD Bank.

39.   Based on all of my examinations to date and the documentation reviewed, it is reasonable to conclude that:

1.   St. Anne-Nackawic was insolvent from January, 2001 until its assignment in bankruptcy on September 15, 2004

2.   St. Anne-Nackawic granted security to St. Anne Industries at a time after material cash advances had already been made by St. Anne Industries to St. Anne-Nackawic. No material advances were made by St. Anne Industries to St. Anne-Nackawic after the granting of the security.

3.   St. Anne Industries did not register its security interest until June 25, 2002, although it advanced funds to St. Anne-Nackawic to pay out the TD Bank between December, 2001 and April, 2002. The 2001 audited financial statements do not make reference to security for these advances;

4.   In January, 2002, $4,326M of debt due to St. Anne Industries from St. Anne-Nackawic was converted from unsecured debt to secured debt;

5.   St. Anne Industries and St. Anne-Nackawic are related companies, and the security granted by St. Anne-Nackawic to St. Anne Industries precluded other creditors from being paid.

40.   I have obtained a legal opinion with respect to the validity of the security granted by St. Anne-Nackawic in favour of St. Anne Industries Ltd. over the debts and obligations of St. Anne-Nackawic. This opinion was obtained in contemplation of litigation.

41.   I may disallow the security claimed by St. Anne Industries Ltd. but I have not completed my review and examinations. In addition, I have not received a Proof of Security from St. Anne Industries and I am therefore not in a position to deal with the security prior to February 12, 2005. Attached hereto as Exhibit "R" is a copy of a letter to St. Anne Industries Ltd. and the Receiver Green Jain Wedlake Inc. dated January 12, 2005 with attached section 128(1) Notice.

42.   It appears that significant payments were made to Parsons & Whittemore, Inc. and St. Anne Industries during March and April, 2004 with respect to arrears on their intercompany accounts.

Other Issues

43.    It is clear from my examinations that the directing mind and senior management were officers of Parsons & Whittemore Inc., and a number of these same individuals were also directors and/or officers of St. Anne Industries and St. Anne-Nackawic.

44.    It is clear that planning, discussion and preparation for filing under the BIA and the CCAA was discussed by management in the late Fall of 2003. Unfortunately, St. Anne-Nackawic and Parsons & Whittemore have all claimed that these discussions were privileged.

45.    In addition, we have obtained correspondence from Allen Dixon Smith Townsend, solicitors for St. Anne-Nackawic, which indicates that insolvency discussions took place with Parsons & Whittemore, St. Anne-Nackawic and St. Anne Industries around the month of March, 2004 involving Paul Goodman, Licensed Trustee in Bankruptcy. Attached hereto as "Exhibit S" is a copy of the said document.

46.    In addition, insolvency practitioners from Ernst & Young met with officers of St. Anne-Nackawic, Parsons & Whittemore, and St. Anne Industries in December, 2003 or January, 2004. Attached hereto as Exhibit "T" is an extract from the examination of Michael Connell.

47.    From my review and examinations to date, the following is also clear:

    1.    inventory levels increased significantly in the two to three months prior to bankruptcy; attached hereto as Exhibit "U" is a copy of actual inventory levels during the year 2004;

    2.    unsecured creditors performed significant amounts of work in the one week prior to the assignment in bankruptcy totaling in excess of $3 million.

48.    As part of the examination of the affairs of the Bankrupt, I have sought to examine Carl C. Landdegger, George F. Landdegger, and Stephen Sweeney, officers and directors of St. Anne Industries Ltd. and Parsons & Whittemore Incorporated, pursuant to section 163 of the BIA. Some of these individuals may now have agreed to be examined by me in the State of New York. The date of the examination has not yet been determined as an agreeable date must also be scheduled with the Registrar in bankruptcy.

49.    I will also be examining, under section 163 of the BIA, certain individuals at Ernst & Young LLP, with respect to the audited financial statements of St.Anne-Nackawic.

50.    There is presently a Preservation Order in place which has been given on the application of two lienholders. This Preservation Order prohibits funds from being removed from New Brunswick.

51.   All of the above issues have been thoroughly discussed with the Inspectors and counsel for the Estate of the Bankrupt in the past two months.  In light of all of the above, the Inspectors have directed me to pursue a Preservation Order in the name of the Estate of the Bankrupt in order to protect the interests of all unsecured creditors which I estimate to be in excess of $69 million.

52.   The Trustee is seeking in this motion:

    1.   An Order, if necessary, for the abridgment of time for service of this motion, excusing the lack of service of this motion, or excusing the lack of service of the Applicant's record on motion pursuant to Rules 1.03, 2.01, 2.02 and 3.02 of the Rules of Court;

    2.   An Order that all proceeds from the realization of the assets, property and undertaking of St. Anne Nackawic Pulp Company Ltd. over which St. Anne Industries Ltd. purports to have security be held in trust by Green Jain Wedlake Incorporated at a Canadian Chartered Bank in New Brunswick until further Order of the Court;

SWORN TO at the City of Saint John, in          )
the County of Saint John and Province of        )
New Brunswick, this 1st Day of February,        )
2005, BEFORE ME:                                )
                                                )
_____                )     _____
A Commissioner of Oaths                         )     Paul A. Stehelin, CA, CIRP
Being a Solicitor                               )

**2. Exhibit 2:    St. Anne Pulp builds record amounts of wood inventory for Landegger's Security.**

Landegger was "priming his assets" by building St Anne's wood inventory the months prior to the Bankruptcy.  Once again there is no doubt, **Landegger was increasing his assets by purchasing a record amount of wood.  As first secured creditor, he held the wood inventory for security.**

St Anne Pulp had the highest volume of wood inventory for the month of September 2004 since the start of the mill in 1970.  The wood deliveries were controlled from New York by Jim Matheson and George Landegger during the months of June, July, August, and right up to the date of bankruptcy, on September 15, 2004. They gave directions to the purchase wood manager, Mack Fox, to buy as much wood as possible.  Having the purchased wood manager dealing directly with New York on decisions regarding wood supply to the mill was not normal.  I became aware of this information as I worked in the Scaling Department at the Scales during this time period.

Please note the following decisions, which were made to increase wood deliveries at an unprecedented rate:

- St Anne was receiving wood deliveries from Prince Edward Island and Nova Scotia, which was highly unusual.

- Tree-length hardwood, which was delivered to the scales, was mixed with birch.  Mixing hardwood and birch was against St Anne's quality control regulations.  The wood was sent to the Pit Area, two miles from the Mill.

- The mill yard was not set up to accept tree-length wood. In my opinion, the wood was accepted mixed and in tree-length form because George Landegger knew Domtar would take it after the mill was bankrupt.  That is exactly where most of the wood, both 8 foot and tree-length was sold (Domtar, Woodland Maine ) for Landegger's security.

- The scales were open 24 hours a day, Monday through Friday, for 6 weeks, during July and August 2004, instead of the regular16 hours a day.  The Scales were open these extra hours to increase wood deliveries.

- The rate per green metric tonne was increased to $67 / tonne for the wood delivered from P.E.I.  This was a very lucrative price for wood in comparison to the average of $45- $50 per tonne.  Coincidentally, all the contractor's purchased wood contracts were to end in September 2004, the very month the Mill went Bankrupt.

- Rex Brown, a retired former Vice President of St Anne Nackawic Woodlands, was called in to assist in building up the wood inventory.  Rex was well known and trusted by wood marketing boards and contractors.  Landegger did not hesitate to tap into Mr. Brown's trustworthiness.  The end result was a huge wood inventory for Landegger, amounting to millions of dollars, which he never had to pay for, and a $25,000 bonus for Mr. Brown.

3. **Exhibit 3:** <u>Landegger purchased his lodge for an undervalued assessment.</u>

The lodge was sold by St Anne Nackawic Pulp Company prior to the bankruptcy. It was sold to a land company called St Anne Realty Ltd. owned by Landegger. Charlie Sergeant (a Fredericton lawyer) and Landegger were directors of this company. This asset was purchased by Mr Landegger for a low price of around $500,000 before the bankruptcy. As a result this valuable property was not included in the assets of St. Anne Nackawic bankruptcy.

An accountant at the mill, who dealt with property, stated St Anne received approximately $500,000 from Landegger. The Sworn affidavit of Mike Connell gave an assessed value of $900,000 to one million dollars. (page 113 Ques. 337) In a court affidavit, submitted on March 7, 2005 by St Anne-Nackawic Retired Salaried Retirees, the lodge was reported to cost $3,000,000. It should be noted the Lodge is built on Ingraham Lake and the grounds encompass the lake completely. The forest land surrounding the lodge and lake consisted of 710 hectares or 1754 acres. As well, there is approximately 3.24 kilometers or 2.0 miles of lakeshore lots. This is a very valuable piece of real estate.



4. **Exhibit 4:** **Paying the Province eight million dollars on their loan, from savings at the end of June 2004, didn't make sense to Landegger.**

Don White, who was the President of St. Anne Nackawic Pulp and also the President of St. Anne Industries, sends a memo to Mr Landegger on February 23, 2004, exhibit 3, in his sworn affidavit. This memo is in response to Landegger wanting to know how much money he can save over the period of time until the contract negotiations are complete. It talks about, "**capital spending being reduced to $100,000 from the previous $400,000 a month. Pension payments, (the shortfall) not being made. Not paying the province for property taxes in May for a million four. Reducing payments on accounts payable over May, June time frame by two million dollars. Collecting a four million dollar tax refund. Those reductions in savings at the end of June going forward were to be 15 million dollars.**"

Don White further states in this memo, "**I believe the only way to avoid payment to the province of 50 percent of surplus cash is if St. Anne is under court protection.**"

Landegger's interpretation of this memo from Don White is, "**what Mr. White is pointing out to me, that if we did all these things, what's the point? Because you just have to pay eight million or some amount back to the province. Which doesn't make sense for us to do because clearly what we are trying to do is get a stronger war chest of money in case we run into problems in the pulp industry or whatever else we have.**"

Landegger refers to the terms of the $15 million dollar loan with the province, "**because under the terms of our loan agreement with the province, they swept any amount over $7 million dollars at the quarterly intervals as their way of being repaid their loan.**"

Landegger does not follow through on Mr. White's recommendations, as $8 million dollars would have to be paid to the province. If the province hadn't put this surplus clause in their contract, Landegger would have had a "**stronger war chest of money**". Landegger and Don White was willing to forego payments on the employee pension liability, the payments to the province for property taxes, as well as accounts payable. The pension plan would have had a much larger deficit. The only reason Landegger paid his bills in this case, is because his only other option was to pay the government, and he certainly did not want to pay them.

This is an example of the decision making process of Landegger and his top people: build your war chest of money at the expense of employee's pensions, the government and unsecured creditors.

Don White even suggests **court protection** as a way to avoid paying the province. Once again, court protection is suggested to secure more money for Landegger and in his own words, "**stronger war chest of money**".

**5.     Exhibit 5:  The Mill could have been sold in May, 2004 instead of going bankrupt in September, 2004.  There was a viable option from a company in India, Aditia Birla, who eventually purchased it and is operating it today.  Mr. Landegger, states in his sworn affidavit, "it has not been for sale in the last 10 years". (see sworn statement)**

**In a sworn statement Dale Patterson, COO for Tembec states Tembec wanted to "purchase St Anne in May 2004" for Aditya Birla. (see sworn statement)**

**The Bankruptcy Act States..........**

**172 (2) The court shall, on proof of any of the facts referred to in section 173, which proof may be given orally under oath, by affidavit or otherwise,**
- (*a*) refuse the discharge of a bankrupt;
- (*b*) suspend the discharge for such period as the court thinks proper; or
- (*c*) require the bankrupt, as a condition of his discharge, to perform such acts, pay such moneys, consent to such judgments or comply with such other terms as the court may direct.

**Under Section 173. (1) (n) the bankrupt**, if the bankrupt could have made a viable proposal, chose bankruptcy rather than a proposal to creditors as the means to resolve the indebtedness.


George Landegger hired Receivers, Green Jain Wedlake Inc. who refused to operate the mill.  The Receiver chose not to run the mill because it was contrary to what Landegger wanted.


If the Mill was down, Landegger could….
- Store his security on the site until it was sold, including the wood and the paper.
- Keep other security, such as the mobile equipment, on the site, until sold.
- With the mill down, it gave the delay required to sell assets.
- Made it difficult for a potential buyer to obtain financing for a mill, which is not operating.
- More costly to start up a mill which is tore apart.
- The shutdown contractors would not be available to work on a startup of the St Anne mill because of commitments to other mills.
- Landegger would have lost his control on the mill.  The courts would have appointed other parties to run the mill.
- Created confusion with employees: unemployed, lost pensions and benefits. Landegger could keep the employees and government's mind on other things while he greedily put his bankruptcy plans in place.
- It gave Aditia Birla extra time to secure large amounts of funding from the New Brunswick government.  They received over 100,000,000 million to start mill. Further they rid themselves of enviornmental concerns and the pension liability for the 725 former employees.  Mr Landegger got his money as first secured creditor and the multi million dollar firm of Aditia Birla received a mill they wanted to purchase in May for a very cheap price.

1                        Landegger
2      you like to replace the Toronto Dominion.
3                   They were not retained to seek a
4      purchaser for the plant.
5           Q.    Was the plant for sale at that point?
6           A.    No.
7           Q.    Was it in play at some point?
8           A.    No.
9           Q.    Has the plant ever been in play?
10          A.    Yes, it was.  It was in play back in -- I
11     would say late eighties maybe.  And there was a
12     Japanese company called Diashowa, D-I-A-S-H-O-W-A,
13     whose chairman was R. Saito, S-A-I-T-O, and they
14     offered 190 million dollars Canadian for the plant.
15          Q.    What year was that?
16          A.    In late eighties, early nineties.
17                And I felt that that was not enough and
18     turned down the offer.
19          Q.    But the company, you're saying, has not
20     been for sale in the last ten years?
21          A.    No, it hasn't been for sale in the last
22     ten years.
23                What the -- what the Nesbitt Burns report
24     did, as one of the four methods they used for us to
25     show what comparable sales had been during the past

- 10 -

Mr. Paterson - Direct

1                A.  Yes.

2     Q.26    And -

3                A.  He's president of the pulp group.

4     Q.27    Okay.  And all the others - Mr. Bajaj, Mr.

5                Jain, Maheshwari, Maru and Saboo are from

6                Aditya Birla?

7                A.  That's correct.

8     Q.28    Okay.  How did you become involved in the

9                Nackawic project?  Maybe you can talk a little

10             bit about that, how you were - you're at AV

11             Cell or AV Cell Inc.  How did you become

12             involved in the Nackawic project?

13             A.  My involvement started in 2003, and that

14             involvement came from a request from Aditya

15             Birla that they were looking to establish a

16             pulp mill somewhere in the world.  They asked

17             to have a list put together of pulp mills in

18             the world that could be reviewed that could

19             make dissolving pulp or were making dissolving

20             pulp.  So there was a list of seven operations

21             put together over a period of about five or six

22             months because you have to do a lot of research

23             to establish which mills could be available.

24             Nackawic was on that list.  In May of 2004, I

25             was informed that Nackawic was for sale.

- 11 -

Mr. Paterson - Direct

1   MR. DAVIDSON: May, 2004?

2   MR. PATERSON: That's correct. I then followed up with

3   a phone call through some sources, and it came - it came

4   back to me that Nackawic was not for sale. So I was told

5   in one call it was for sale and the next - within two

6   weeks, it - I had a return call that said no, it will not

7   be sold at that time.

8   Q.29   Okay.

9         A. So there was some discussion of it being

10       for sale, so we dropped it. We had done due

11       diligences, or not - preliminary due diligence

12       on a mill in the old Eastern Block countries of

13       Europe and at Port Alice, British Columbia.

14   Q.30   Okay.

15         A. And we were starting to embark on a due

16       diligence of a mill in Australia.

17   Q.31   Okay.

18         A. And on September 14th, I received a call

19       about 9:30 in the morning that said Nackawic

20       was out of business permanently, that they

21       would - they were bankrupt and would no longer

22       exist as St. Anne-Nackawic.

23   Q.32   And that was September 14th, 2004?

24         A. Yes. The day the mill went bankrupt. It

25       was about 9:30 in the morning, 10:00. It was

- 12 -

Mr. Paterson - Direct

1      before lunch time.   I then let the principals

2      know that Nackawic was coming available, and it

3      took about two or three weeks of people mulling

4      it  over  and  then  I  was  asked  to  make  an

5      approach  to  the  government  at  that  time  -

6      Business New Brunswick, in particular, and made

7      an  approach  and  we  had  some  discussions,  and

8      I'm not sure of the exact date, but we arranged

9      through October for a due diligence team to be

10     assembled.

11  Q.33   October of 2004?

12         A.    Yeah,  we  were  arranging  that,  and  we

13     brought  people  from  India  and  accumulated

14     people from across the Tembec system that had

15     expertise in different areas, and we conducted

16     a due diligence that was about one week long.

17     We met with different people in the mill.   We

18     met  Barry,  we  met  other  people,  and  the

19     objective and the exercise was to establish the

20     condition  of  the  mill,  the  operating  cost  of

21     the  mill,  what  the  future  could  hold,  and

22     whether or not the mill could be viable in its

23     current day operation.

24  Q.34   Okay.

25         A.    That  was  completed  in  probably  early  or

6. **Exhibit 6:** <u>**George Landegger transferred a loan of 4.3 million dollars from unsecured**</u>
<u>**debt to secured**</u>.

The Judge feels the $4.3 million dollars is an issue to be "tried". "**There would appear to be $4.3**
**million of unsecured debt which was converted to secured debt which is at least one issue that**
**would have to be addressed. It is not to be determined on the hearing of this motion but at**
**least, in my opinion, is an issue to be tried**." Previously the $4.3 million was non-interest
bearing, unsecured, and had no set terms of payments. Now the loan is secured and has an interest
rate of 6.7 percent.

Don White does not declare the security for the $4.3 million dollar loan when questioned under
oath by the Official Receiver in his examination report of Mr. White, which was presented at the
first creditors meeting on October 1, 2004. Please see the following statements:

Question 49 to Mr. White (page 20&21) "**Please indicate when the transaction(s) took place**
**that created the security interest in the assets. What was the consideration given to the**
**bankrupt in return for the security provided?**"

Mr. White's response: " **to the best of my knowledge, the transaction took place June/July of**
**2002. It was a loan of $24,787,881 USD to St Anne Nackawic Pulp Company Ltd. within the**
**year approximately before June/July of 2002. In return for this loan, St. Anne Industries Ltd.**
**took a General Security Agreement against the bankrupt**." …. **the majority of the funds were**
**paid to the lenders who had been funding our operation, and a small amount was used in**
**normal operations**.
Mr. White did not mention the $4.3 million dollars and the Appeal Court Judge identified this illegal
act.

7.  **Exhibit 7: <u>The Judge questions…..  Green Jain Wedlake Inc. and St Anne Industries –
Hands Clean?</u>**

The Judge states,  "**In short, the applicants for the preservation order came to the court with
clean hands.  The original trustee and St. Anne Industries came with hands coated in latex. In
time, the successor trustee will be able to peel back the outer covering and determine the state
of their cleanliness.**"

[34]  There is in my opinion a potential for a conflict of interest and, more importantly, there is the
appearance of conflict.  In any event, it is obvious that circumstances now prevent several of the
unsecured creditors from working in harmony with the current Trustee.

[40]  **In the result, I conclude that both an <u>actual and perceived conflict of interest exist in this
case</u> and several of the creditors are not able to work in harmony with the Trustee.**  It would
cost a substantial amount of money in the circumstances to hold a creditors' meeting to remove the
Trustee.

**8. Exhibit:** George Landegger had a three-year criminal investigation done on him by the IRS and the Department of Justice. He **never filed federal income tax returns for the years 1996 through 1999. See court document from the District of Connecticut below.**

## I.   Factual Background

Count I of the Information provides that from March 1999 through January 2001, defendant told IRS agents and officers "who were conducting an audit and examination relating to P&W and [George Landegger], respectively, that [George Landegger's] individual federal income tax returns, Forms 1040, for the tax years 1996 through 1999 had been filed with the IRS, when in truth and in fact, as defendant . . . knew, [George Landegger's] tax returns had not been filed with the IRS." Information [Doc. # 1] ¶ 5. The Stipulated Offense Conduct also provides that in March 1999 and again in April 2000-January 2001, Schwartz falsely represented to an IRS agent that the Landegger returns at issue had been filed when in fact he knew that was not the case.